Rick W. LOGAN, Appellant,

v.

A.L. LOCKHART, Director, Arkansas Department of Corrections, Appellee.

Nos. 92–2745, 92–2752.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 23, 1993.

Decided June 7, 1993.

Jennifer M. Horan, Fayetteville, AR, argued, for appellant.

Olan W. Reeves, Little Rock, AR, argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, HEANEY, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Petitioner Rick Logan brings companion habeas corpus actions under 28 U.S.C. § 2254. He attacks his convictions, obtained in two trials, on a number of counts of rape and carnal abuse.

Logan, an employee of the Sunshine School, a facility for developmentally handicapped students in Benton County, Arkansas, was convicted of raping Joey B., a 17–year–old student at the school. For that conviction, Logan was sentenced to life in prison, and the conviction was affirmed on appeal. *Logan v. State*, 300 Ark. 35, 776 S.W.2d 341 (1989) (*Logan III*). Logan was unable to pursue state post-conviction relief because the deadline for doing so passed before his direct appeal was decided. Logan attacks this conviction on five grounds: (1) that the jury was biased; (2) that the prosecuting witness was incompetent to testify; (3) that the prosecution withheld favorable evidence; (4) that the prosecutor was guilty of misconduct; and (5) that the trial court improperly excluded evidence of the victim's prior sexual behavior. The district court denied the petition on all grounds, and we affirm.

Logan was convicted in a separate trial of raping seven other Sunshine School students. For these crimes, Logan was sentenced to seven consecutive 40–year terms. The Arkansas Supreme Court affirmed six of those convictions and reduced one to carnal abuse. *Logan v. State*, 299 Ark. 266, 773 S.W.2d 413 (1989) (*Logan II*). Logan attacks these seven convictions in the second habeas petition before us. The district court dismissed that petition based on the concurrent sentence doctrine. We conclude that the district court incorrectly applied the concurrent sentence doctrine in finding the second petition moot, and we remand for consideration of that petition's merits.

## I.

Logan asserts that his trial for the Joey B. rape was not fair because a biased juror sat on the jury that convicted him. Logan was unable to eliminate the objectionable juror, a Ms. Sutterfield, because the trial judge declined to dismiss her for cause, and he had already used all of his peremptory challenges.

 In *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), the Supreme Court held that whether a juror "could set aside an opinion held and decide the case on the evidence" is a question of "historical fact" for the state trial court. *Id.* at 1036, 104 S.Ct. at 2891. Under 28 U.S.C. § 2254(d), a habeas court must, of course, afford this determination the presumption of

correctness due a state court's factual findings. *Swindler v. Lockhart,* 885 F.2d 1342, 1349 (8th Cir.1989) (citing *Patton v. Yount,* 467 U.S. at 1036–38, 104 S.Ct. at 2891–92), *cert. denied,* 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). The question for this court, then, is whether the state court's conclusion that the juror would be impartial is fairly supported by the record. *Id.* (citing *Patton v. Yount,* 467 U.S. at 1038, 104 S.Ct. at 2892).

■ Petitioner focuses upon Ms. Sutterfield's statement to his attorney during voir dire that, "[Y]ou will have to show me that, with the witnesses that you bring, that he's innocent." This statement, alarming on its face, must be placed in context. Ms. Sutterfield was one of the last of the venire questioned, and defense counsel, almost certainly relying on Ms. Sutterfield's presence during the entire voir dire, made a truncated reference to the presumption of innocence. She asked Ms. Sutterfield, "I guess you … understand all the burden and all that kind of stuff?" Ms. Sutterfield agreed that the State had the burden of proof, but then volunteered her remark about the defendant having "to show [ ] that … he's innocent." Thus it appears that she may have thought the burden could shift to the defendant at some point during the trial, an obvious misconception. Alternatively, this may have been only a remark about the order of proof, especially since Petitioner's counsel had emphasized during voir dire that her client's chance to put on a case was postponed until the State had finished its proof. Whatever the precise nature of Ms. Sutterfield's misconception, her statement seems to us not necessarily to reflect bias, but rather a misunderstanding of a legal principle with respect to which Ms. Sutterfield had not yet been instructed. Defendant's counsel did not at this point ask the trial judge to instruct Ms. Sutterfield on the rules regarding the burden of proof in a criminal case. We note, too, that Ms. Sutterfield went on to say that she had no bias in the matter, and the trial court could have properly relied on that statement in ruling on the challenge for what defense counsel characterized as "implied bias."

We find that the trial judge's conclusion that Ms. Sutterfield would be impartial is fairly supported by the record. Finding no constitutional infirmity with the jury, we affirm the district court on this issue.

## II.

■ Petitioner's next argument is that Joey B., the 17–year–old, mildly retarded victim, was incompetent to testify. In a habeas proceeding, we ask whether the testimony in question "was so grossly unreliable" that it "infected and fatally undermined" the fairness of the trial, *Peters v. Whitley,* 942 F.2d 937, 940 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1220, 117 L.Ed.2d 457 (1992), "so as to make the resulting conviction a denial of due process." *Amos v. Minnesota,* 849 F.2d 1070, 1072–73 (8th Cir.), *cert. denied,* 488 U.S. 861, 109 S.Ct. 159, 102 L.Ed.2d 130 (1988).

■ Petitioner's trial counsel questioned Joey's competency because of his handicap, but the trial court denied Logan's belated motion for a competency hearing. A review of the transcript shows that Joey was able to provide accurate testimony about himself, his family, his employment history, and his former school. Joey was also able to describe the sexual attacks by Logan in considerable detail. We hold that it was not error for the trial judge to find that Joey was competent to testify, and we agree with the district court that Logan has not shown that Joey's testimony was so unreliable as to amount to a denial of due process.

## III.

■ Joey was the first student to report a sexual assault by Logan. He did so in October, 1985, while he, Logan, and other Sunshine School staff and students were on a retreat in Fayetteville (Washington County), Arkansas. At that time, Joey reported only that Logan had performed oral sex on him several times during the previous night. The first Sunshine School employee to speak to Joey about the matter asked him only a few

questions.[1] That employee reported the matter to her supervisor who took Joey to the police. When Joey subsequently reported that Logan had been sexually assaulting him on a regular basis for more than two years, he also provided the names of other students who had been sexually assaulted by Logan (Logan allegedly made Joey "stand guard" during these incidents). Sunshine School staff then interviewed a number of students in an effort to identify all those who had been abused. Most of these interviews were videotaped. Joey was never taped by the Sunshine School staff.

During preparation for these companion cases, Petitioner's trial counsel requested access to all existing videotapes of either the alleged child victims or other Sunshine School students. Most such videotapes were unavailable for defense review because they had been destroyed. The only tape[2] that had not been destroyed was in the possession of a juvenile judge who was considering a collateral matter. Responding to defense counsel's request to see the tape, the prosecuting attorney told the trial court that the tape was not "relevant" because it did not show or involve questioning of students who were designated "victims" in the criminal cases against Logan. The prosecuting attorney told the court that the tape contained no information exculpatory of Petitioner and that, in fact, it incriminated Logan. Petitioner now claims that the videotape contained exculpatory evidence because it showed one student stating that Logan had never sexually assaulted her and two stating that they had been sexually assaulted by people other than Logan. The statement of the first student can hardly be considered exculpatory; it is, at best, neutral. As for the other two children, one stated that her father had sexually assaulted her and indicated that Logan had assaulted her by identifying an anatomically correct doll as "Rick". The other said that she had been sexually assaulted by her

brother. Neither family member was associated with the Sunshine School, and there was no implication that either had assaulted anyone other than his family member. With the exception of the statement that directly incriminated Logan (he was never tried for assault of the female student), the substance of the taped statements was not relevant to the charges against Logan, and none of it could be characterized as exculpatory.

Additionally, Petitioner suggests that the tape reveals the coercive, overbearing, and improper nature of the interviewing techniques used by Sunshine School staff. The district court held simply that the "matter of the tapes is not relevant to this case" because "Joey B. was the first student to report abuse which was before the videotaping and [Joey] was not videotaped. Further", the district court observed, "there is no suggestion [Joey's] trial testimony was contaminated because of the taping." Petitioner asserts on appeal that the tape is relevant because "the record establishes that [Joey] was interviewed repeatedly by the Sunshine staff people, even though the interviews were not preserved on tape." Having thoroughly reviewed the record, we are unable to substantiate this claim. Without determining whether Sunshine School employees used improper interviewing techniques, we conclude only that Joey appears not to have been subjected to extended questioning by them and therefore that the taped evidence was not material to this conviction.

Finally, while we find that the tape had no bearing whatsoever on the Joey B. (*Logan III*) conviction, we decline to comment on the relevance of the tape to the *Logan II* conviction, also before us on a habeas petition, because a number of the prosecuting witnesses in that case may have been subject to the interviewing techniques featured on the tape.

---

1. Joey first told Jeff, a boy about Joey's age, of Logan's assaults. Jeff told his mother, a nurse who worked with the Sunshine School. The nurse, without speaking to Joey, reported the matter to a Sunshine School employee, Pam Biesiot, who then approached Joey and briefly questioned him.

2. Prior to his habeas hearing in U.S. district court, Petitioner learned of the existence of two tapes, not just one as the parties had previously assumed. One tape is simply a continuation of the other, and both were introduced at the hearing.

## IV.

Petitioner maintains that the prosecuting attorney engaged in misconduct so prejudicial that Logan was denied due process. The limited facts relevant to the issue of prosecutorial misconduct are these. When, in October, 1985, Joey reported that Logan had performed oral sex on him during the previous night at the retreat in Fayetteville (Washington County), Arkansas, Joey was taken to the police to report the incident. Joey's parents then took him to be examined by a physician, who found evidence of oral sex. Joey later reported that Logan had been sexually assaulting him on a regular basis for quite some time. Joey described incidents of oral sex (being forced to perform the act on Logan as well as Logan performing it on him), anal penetration by Logan's penis, and anal penetration by Logan's finger. Most of these assaults allegedly occurred in one of the boys' restrooms at the Benton County Sunshine School. Although Joey's difficulty with dates and the passage of time prevented him from saying with any certainty when the assaults began, the Benton County prosecutor charged Logan with a single count of rape (engaging in sexual intercourse or deviate sexual activity[3] by forcible compulsion) and alleged in the information that this occurred "on or about the 1st day of March, 1983 through the 13th day of October, 1985."

At the trial on the Benton County charges, which we review here, the prosecutor sought to introduce into evidence the results of Joey's October, 1985, medical examination. The trial judge excluded it because of its direct relation to the Washington County assault, for which charges were then pending in another jurisdiction. (The logic or propriety of this ruling is not before us.) At trial, the State's primary evidence was Joey's testimony. The State also presented evidence of Logan's opportunity to commit the acts alleged, as well as evidence that the change in Joey's behavior during the time the assaults were allegedly ongoing was consistent with sexual abuse.

In her closing argument, Logan's defense counsel, following a theme of how little evidence the State had presented and how much of the evidence went to Joey's credibility, asked, "Where is the medical testimony of October '85 when Joey came forward"? The prosecutor immediately objected, arguing at the bench that defense counsel's argument was in "bad faith" because she knew that an exam had been done in October, 1985, but that it had been excluded. Once defense counsel explained that she was alluding to the fact that no anal examination was ever done, the trial judge—we think correctly—allowed her to proceed. She went on to emphasize that there would surely be evidence of anal scarring if the events alleged had indeed been occurring for some two and a half years, yet none had been presented.

On his rebuttal closing, the prosecutor stated:

> I suggest to you that one of the Defendant's arguments is extremely unfounded and it's known by the defense attorney, she suggested that at the time he made his allegation in October he should have been taken to a doctor and there would have been signs found of sexual abuse. The defense attorney knows full well there was a medical examination.

Defense counsel objected to the comments and, in front of the jury said, "he's telling the jury about a medical report that you ruled was inadmissible in this case ... it's totally improper." The lawyers approached the bench and, after discussion, the court sustained defense counsel's objection. Defense counsel did not request a curative instruction to the jury, and the judge issued none. Nor did defense counsel move for a mistrial. Petitioner now argues, however, that the prosecutor's improper statement was so damaging that it constituted a denial of due process.

■■ A deprivation of due process is established when an error is "gross, conspicuously prejudicial or of such import that the trial was fatally infected." *Rhodes v. Foster*, 682 F.2d 711, 714 (8th Cir.1982) (citing *Mag-*

---

3. "Deviate sexual activity" includes all the acts Joey alleged. *See* Ark.Code Ann. § 5-14- 101(1)(A) and (B).

gitt v. Wyrick, 533 F.2d 383, 385 (8th Cir.), cert. denied, 429 U.S. 898, 97 S.Ct. 264, 50 L.Ed.2d 183 (1976)); see also Ellis v. Black, 732 F.2d 650, 657–58 (8th Cir.1984). In deciding this kind of issue, we "review the totality of the facts in the case and analyze the fairness of the trial." Ferguson v. Jones, 905 F.2d 211, 213 (8th Cir.1990) (quoting Manning–El v. Wyrick, 738 F.2d 321, 322–23 (8th Cir.) (per curiam), cert. denied, 469 U.S. 919, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984)). Having thoroughly reviewed the record and analyzed the fairness of the trial, we conclude that the prosecutor's statement does not rise to the level of a due process violation. We are admittedly troubled because these comments may have impeded the jury's ability to judge the evidence fairly, see United States v. Young, 470 U.S. 1, 12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985), especially ·given the close temporal proximity of the comments to the beginning of its deliberations. The prosecutor's comment on rebuttal closing left the jury with the impression that Joey had in fact undergone a medical examination. More significantly, because the prosecutor obviously had wanted the evidence of that examination admitted, the jury could easily have concluded that it would have supported the State's case. We find the prosecutor's remarks highly improper.

Defense counsel's failure to seek a corrective instruction or to move for mistrial is, however, critical to our conclusion that Petitioner was not denied due process by the prosecutor's objectionable comments. While we think the comments at issue were likely injurious, we are unwilling to say that the trial judge was constitutionally required to admonish the jury absent a request from defense counsel. We therefore find no constitutional error.

## V.

Petitioner next asserts that the trial court improperly excluded evidence of Joey's prior sexual behavior. Specifically, Petitioner complains on appeal that he should have been able to present evidence of Joey's participation in two homosexual incidents in 1979, acts into which he was "led" by other children; evidence of his vasectomy, initiated

by his parents' desire to avoid the consequences of his sexually aggressive behavior; and evidence of occasions when he masturbated in public. The trial court ruled in an in camera hearing that this evidence should be excluded, finding it either not relevant or more prejudicial than probative.

Questions regarding admissibility of evidence are matters of state law, and they are reviewed in federal habeas inquiries only to determine whether an alleged error infringes upon a specific constitutional protection or is so prejudicial as to be a denial of due process. Ferguson v. Jones, 905 F.2d 211 (8th Cir.1990) (quoting Manning–El v. Wyrick, 738 F.2d 321, 322 (8th Cir.) (per curiam), cert. denied, 469 U.S. 919, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984)). Denial of due process is established in the same fashion discussed above in relation to prosecutorial misconduct, namely, by proving that the asserted error was "so conspicuously prejudicial or of such magnitude that it fatally infected the trial and deprived [the defendant] of fundamental fairness." Id. at 213.

When the prosecuting attorney asked Joey at trial if Logan was "the only one that's ever done those bad things to you", Joey answered affirmatively. Logan then sought to impeach Joey by introducing evidence of the two homosexual incidents in his past. Logan argued that the prosecutor had "opened the door" to such contradictory testimony, but the trial court excluded it. The Arkansas Supreme Court affirmed the ruling, stating:

> Whether the victim had such experiences or not, they were not the same or similar to forcible rape and abuse by an adult male over a period of more than a year. We find no abuse of discretion in the court's refusal to admit this evidence.

Logan III, 300 Ark. at 41–42, 776 S.W.2d at 344. We question the logic of the Arkansas Supreme Court, which assumed that the act by Logan was forcible when, in fact, that was the ultimate jury question, the answer to which would have been influenced by impeaching evidence of the victim's past homosexual activity. Still, we cannot say that the trial court's exclusion of the evidence was

inconsistent with Arkansas's rape shield law or with Arkansas evidentiary principles more generally. The Arkansas rape shield law prohibits evidence of a victim's past sexual activity unless the trial court determines, in camera on written motion, that the evidence is relevant. Ark.Code Ann. § 16–42–101. The trial court's initial determination that this. evidence was not legally relevant was manifestly not a violation of due process. As for Petitioner's argument that Joey's denial of past homosexual activity opened the door to such evidence, we note simply that the trial judge has great discretion in determining whether so-called curative evidence should be admitted, particularly where it goes to a collateral matter. *See Hubbard v. State*, 306 Ark. 153, 812 S.W.2d 107 (1991) (trial court has wide discretion in evidentiary rulings and will not be reversed absent abuse of discretion); *see also Peters v. Pierce*, 308 Ark. 60, 823 S.W.2d 820 (1992) (Corbin, J., dissenting) (noting that Arkansas Supreme Court has relied on "opening the door" theory to affirm admission of otherwise inadmissible evidence, but has not relied on theory to reverse trial court's decision to exclude evidence). Such curative or rebuttal evidence is usually allowed only when a criminal defendant is the witness who "opens the door". *See* 27 *Wright & Gold, Federal Practice and Procedure*, 546–47 and nn. 35–39 (discussing Fed.R.Evid. 607). Finally, a determination regarding the admission of such rebuttal evidence is subject to Rule 403 analysis, and we cannot conclude that the trial judge was wrong to hold that the evidence of Joey's past homosexual activity was more prejudicial than probative. *See McFadden v. State*, 290 Ark. 177, 717 S.W.2d 812, 813–14 (1986) (rebuttal evidence is subject to Rule 403 analysis); *see also Ward v. State*, 236 Ark. 878, 370 S.W.2d 425 (1963).

We therefore conclude that the trial court's exclusion of evidence of Joey's past homosexual activity was consistent with Arkansas law. We cannot say, more importantly, that exclusion of the evidence was so conspicuously prejudicial that it fatally infected the trial and denied Logan fundamental fairness.

■ The Arkansas Supreme Court also agreed that the trial court properly excluded evidence of the incidents of Joey's public masturbation and of his vasectomy. The court concluded that both matters had little if any relevance to the question of whether Logan committed rape, but that the evidence had a strong tendency to disparage Joey's character. Both state courts noted that other evidence tending to prove Joey's past behavioral problems—the proposition for which the evidence was proffered—had already been admitted. *Logan III*, 300 Ark. at 41–42, 776 S.W.2d at 344. Again, this ruling is consistent with Arkansas precedent. *Bennett v. State*, 297 Ark. 115, 759 S.W.2d 799 (1988) (determination of probative value versus prejudice is left to trial judge). The exclusion of the evidence was certainly not so prejudicial to Petitioner's case as to result in a denial of due process. We therefore find no constitutional error in these evidentiary rulings.

## VI.

■ In *Logan II*, the companion habeas case before us, the district court declined to review the merits of the petition. The district court, applying the so-called concurrent sentence doctrine, considered the matter moot because of Petitioner's life sentence on the *Logan III* conviction. The court based this conclusion on the assumption that Petitioner had no possibility of parole under such a sentence. We believe that this was error. The magistrate judge's Report and Recommendation stated that Petitioner is serving a "life sentence without parole" because "[i]n Arkansas, a life sentence means life without parole. Ark.Code Ann. § 5–4–606." That statement is incorrect. Logan's sentence for *Logan III* is "life". Often referred to as "straight life", this sentence is distinguishable from "life imprisonment without parole". The former sentence may be imposed for conviction on a Class Y felony, such as rape. *See* Ark.Code Ann. § 5–4–401; § 5–14–103(b). The latter sentence may be imposed only for conviction of capital murder. *See id.* at §§ 5–4–602(3), 5–4–606. A person sentenced to so-called straight life is ineligible for release on parole unless the sentence is commuted to a term of years by executive clemency. Upon commutation, the inmate

becomes eligible for release on parole under the usual procedures. Ark.Code Ann. § 16–93–607(c)(1). A person sentenced to life imprisonment without parole, on the other hand, is ineligible for release on parole but may be pardoned or have his or her sentence commuted by the Governor. *Id.; see also Rogers v. State,* 265 Ark. 945, 582 S.W.2d 7, 11–15 (1979). Neither, then, is eligible for parole absent executive action. But the Arkansas Supreme Court has stated that commutation of a "straight life" sentence is "not a remote contingency". *Rogers,* 582 S.W.2d at 15. In support of its assessment of the possibility of parole, the *Rogers* court noted that between 1974 and 1979, the Arkansas Governor had commuted 30 "straight life" sentences to terms of years. *Id.*

This court has been reluctant to apply the concurrent sentence doctrine, seeming to require "no possibility" of prejudicial collateral consequences attendant upon the convictions—not just a slim possibility—before denying review on the merits. *See United States v. Belt,* 516 F.2d 873, 876 (8th Cir. 1975), *cert. denied,* 423 U.S. 1056, 96 S.Ct. 790, 46 L.Ed.2d 646 (1976); *Goodloe v. Parratt,* 605 F.2d 1041, 1044 n. 7 (8th Cir.1979); *see also Lee v. Lockhart,* 754 F.2d 277, 279–80 (8th Cir.1985) (Henley, J., concurring). Because Petitioner's life sentence in *Logan III* may be commuted to a term of years so that he will become eligible for parole, adverse collateral consequences may result from failure to review the *Logan II* conviction. We therefore reverse and remand this petition to the district court for consideration on the merits.